# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DEBRA A. MAJERUS,**
           **Plaintiff,**

    **v.**                                      **Case No. 14-C-1178**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
           **Defendant.**

---

## DECISION AND ORDER

Plaintiff Debra Majerus applied for social security disability benefits, claiming that she could not work due to a variety of conditions, including mental impairments and fibromyalgia. The Social Security Administration ("SSA") denied her claim initially and on reconsideration, as did an Administrative Law Judge ("ALJ") after a hearing. The Appeals Council then denied plaintiff's request review. Plaintiff now seeks judicial review of the denial.

## I. LEGAL STANDARDS

### A.    Disability Standard

Disability is determined under a sequential, five-step test. E.g., Moore v. Colvin, 743 F.3d 1118, 1121 (7th Cir. 2014). At step one, the ALJ asks whether the claimant engaged in substantial gainful activity ("SGA") since her alleged onset of disability. Substantial gainful activity is work activity that involves doing significant physical or mental activities, for pay or profit, 20 C.F.R. § 404.1572, and the regulations set forth earnings levels ordinarily indicative of SGA. See 20 C.F.R. § 404.1574(b)(2). If the claimant is working at SGA levels, she will be found not disabled. 20 C.F.R. § 404.1520(b).

Second, if the claimant is not working, the ALJ determines whether she suffers from a severe, medically determinable impairment or impairments. An impairment is "severe" if it significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

Third, if the claimant has severe impairments, the ALJ determines whether any of those impairments qualify as presumptively disabling under the agency's Listings. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. In order to meet a Listing, the claimant must present evidence showing that she satisfies each of its "criteria." See Maggard v. Apfel, 167 F.3d 376, 379-80 (7th Cir. 1999). For instance, the "paragraph B criteria" of the mental impairment Listings have four components: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked, and extreme, and the degree of limitation in the fourth (episodes of decompensation) using a four-point scale: none, one or two, three, and four or more. 20 C.F.R. § 404.1520a(c)(4). A claimant meets the Listing if she establishes at least two of the following: "marked" restriction in daily activities; "marked" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence, or pace; and "repeated" episodes of decompensation, each of extended duration. See, e.g., Larson v. Astrue, 615 F.3d 744, 748 (7th Cir. 2010).

Fourth, if the claimant's impairment does not meet or equal a Listing, the ALJ determines whether she retains the residual functional capacity ("RFC") to perform her past work. 20 C.F.R. § 404.1520(e) & (f). RFC is the most an individual can do, despite her impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or

2

an equivalent work schedule.  SSR 96-8p, 1996 SSR LEXIS 5, at *5.

Fifth, if the claimant cannot perform her past work, the ALJ determines whether she can make an adjustment to other work in the economy.  20 C.F.R. § 404.1520(g).  The claimant bears the burden of presenting evidence at steps one through four, but if she reaches step five the burden shifts to the agency.  See, e.g., Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).  The ALJ may meet this burden by summoning a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite her limitations.  See, e.g., Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994).

**B.    Judicial Review**

Because the Appeals Council declined plaintiff's request for review, the ALJ's ruling represents the Social Security Commissioner's final decision for purposes of judicial review. Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015).  The court will reverse an ALJ's decision if it is not supported by substantial evidence, meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, id., or if it is the result of an error of law, Farrell v. Astrue, 692 F.3d 767, 770 (7th Cir. 2012).  The court may not re-weigh the evidence or substitute its judgment for the ALJ's, but this does not mean that the court simply rubber-stamps the decision without a critical review of the evidence.  Minnick, 775 F.3d at 935. In rendering his decision, the ALJ is not required to provide a complete, written evaluation of every piece of testimony and evidence, but he must build a logical bridge from the evidence to his conclusion.  Id.  If the ALJ fails to discuss material, conflicting evidence the matter must be remanded.  See Walters v. Astrue, 444 Fed. Appx. 913, 917 (7th Cir. 2011) (citing McKinzey v. Astrue, 641 F.3d 884, 891 (7th Cir. 2011)).

3

## II. FACTS AND BACKGROUND

### A.    Overview of Case

For approximately 20 years, plaintiff and her husband operated a dairy farm while raising three children. Following their separation in late 2004/early 2005, plaintiff obtained several short-term jobs, none of which she was able to maintain. Plaintiff claimed that she could not sustain full-time employment due to lack of focus and attention related to her mental impairments,[1] and pain, fatigue, and stiffness related to her fibromyalgia.

The record compiled by the SSA contains treatment notes for mental and physical problems dating back to 2003,[2] but in the instant application for disability benefits, filed in February 2011, plaintiff alleged an onset date of June 30, 2007. I first summarize the medical and vocational evidence pertinent to the period under review, before turning to the procedural history of the case.

### B.    Medical/Vocational Evidence

#### 1.    Mental Health Treatment

##### a.    St. Agnes Behavioral Health

From March 2007 to May 2008, plaintiff received mental health treatment at St. Agnes Hospital Behavioral Health, seeing Sherry Peck, MSCP, and Nancy Thompson, Ph.D., for

---

[1]Plaintiff received various diagnoses over the years, including bipolar disorder, adjustment disorder, mood disorder, major depressive disorder, anxiety disorder, post-traumatic stress disorder ("PTSD"), dependent personality disorder, and dissociative disorder. She also had a history of alcohol abuse.

[2]The transcript includes treatment notes from St. Agnes Behavioral Health circa 2003-06 (Tr. at 476-91); a December 30, 2003, MRI showing minor diffuse bulging of the L3-4 disc but no significant protrusion of the other lumbar discs (Tr. at 475); back injections in 2004 (Tr. at 445-54) and physical therapy in 2005 (Tr. at 457-58); and a March 29, 2006, vocal cord biopsy (Tr. at 499).

4

therapy, and Mary Kirkwood, M.D., a psychiatrist, for medications. (Tr. at 286-313.) During her April 9, 2007 session with therapist Peck, plaintiff reported that her husband refused to pay maintenance, causing financial stress. She reported suicidal thoughts but promised she was safe. She also indicated that she had started real estate school. (Tr. at 308.)

On April 11, 2007, plaintiff saw Dr. Kirkwood, feeling lethargic on Lithium.[3] She reported wheezing in her chest and felt she was having an allergic reaction. She did feel less depressed, able to relax, with no suicidal ideation. She had become overwhelmed when her husband withheld funds, considering suicide, but dismissed that plan. She appeared tired and constricted but with appropriate affect and no suicidal ideation at the time. Dr. Kirkwood assessed bipolar disorder, discontinued Lithium, added Tegretol,[4] and continued Effexor.[5] (Tr. at 308.)

On April 16, 2007, plaintiff saw counselor Peck, reporting that she was doing better. She believed her medications were doing okay. Plaintiff reported being manic on Friday, needed to do something, and scratched her face. She described feeling like it was not her and was looking down. They also discussed past abuse experiences. (Tr. at 309.)

On April 25, 2007, plaintiff saw Dr. Kirkwood, reporting that Tegretol made her extremely tired. She felt less depressed but with poor energy. Dr. Kirkwood assessed bipolar disorder,

---

[3]Lithium is used to treat the manic episodes of manic depression (bipolar disorder). http://www.drugs.com/lithium.htm.

[4]Tegretol (carbamazepine) is used to treat bipolar disorder. http://www.drugs.com/tegretol.html.

[5]Effexor (venlafaxine) is used to treat major depressive disorder, anxiety, and panic disorder. http://www.drugs.com/effexor.html.

5

discontinued Tegretol, started Lamictal,[6] and continued Effexor. (Tr. at 309.)

On May 14, 2007, plaintiff saw Peck for therapy, reporting reduced concentration, increased stress, and legal issues related to her divorce. She had been accused of faking physical problems in order not to have to work. She continued to be in a lot of pain, needing support and encouragement. Peck referred her to Dr. Thompson for further therapy. (Tr. at 310.)

On May 18, 2007, plaintiff saw Dr. Kirkwood, reporting that she threw her back out and went to urgent care; she was seeing physical therapy and a chiropractor. She had been given Vicodin but only took one, concerned about the reaction with Lamictal. She also had muscle relaxants but did not take them because they made her too sleepy. She reported that she was still depressed, with reduced concentration. She did feel the Lamictal helped, as she was no longer suicidal. She appeared somewhat tired, but her affect was full range with no suicidal ideation. Dr. Kirkwood diagnosed bipolar disorder, continued Lamictal and Effexor, and gave her a slip excusing her from work. (Tr. at 310.) Plaintiff missed her June 2007 sessions with Drs. Kirkwood and Thompson. (Tr. at 311.)

On July 17, 2007, plaintiff returned to Dr. Kirkwood, feeling overwhelmed and depressed. She had missed her appointments due to disorganization and inability to concentrate. She had tearful, dysphoric affect, but denied suicidal ideation. Dr. Kirkwood assessed bipolar disorder, increased Lamictal and continued Effexor. (Tr. at 312.)

On July 23, 2007, plaintiff saw Dr. Thompson for psycho-therapy, on transfer from counselor Peck, who had left the hospital. Plaintiff reported being in crisis, as her significant

---

[6]Lamictal (lamotrigine) is used to delay mood episodes in adults with bipolar disorder (manic depression). http://www.drugs.com/lamictal.html.

other had attempted suicide the previous night. She appeared distraught, with dysphoric affect. (Tr. at 301.) On July 24, plaintiff called regarding medication for anxiety and saw Dr. Kirkwood on July 25, receiving Seroquel.[7] (Tr. at 301-02.) Plaintiff canceled her July 30 session with Dr. Thompson. (Tr. at 302.)

On July 31, 2007, plaintiff returned to Dr. Kirkwood, feeling more rested and less overwhelmed. She reported no medication side effects. Dr. Kirkwood again assessed bipolar disorder and continued Lamictal and Seroquel. Plaintiff also requested a letter for her lawyer in the divorce proceeding, which Dr. Kirkwood provided. (Tr. at 302.) In the July 31, 2007 letter, Dr. Kirkwood wrote:

> I have been treating Deb Majerus since 3/07 for bipolar disorder, most recently depressed. Because of the severity of her symptoms, she is unable to work at this time. She has been compliant with treatment, and we have been trying a variety of medications to manage her symptoms. Most recently, she has suffered significant insomnia, depressed mood, [reduced] concentration, [and] hopelessness. I hope that once her symptoms are stabilized, she will be able to work again.

(Tr. at 251.)[8]

On August 1, 2007, plaintiff returned to Dr. Thompson, doing a bit better. She had reached a custody agreement with her husband. Her affect was brighter. She needed encouragement to keep stress down, and Dr. Thompson provided resources for support groups. Plaintiff canceled her appointment on August 21. (Tr. at 313.)

On August 29, 2007, plaintiff saw Dr. Kirkwood, reporting that she was pleased with the

---

[7]Seroquel (quetiapine) is used to treat schizophrenia, bipolar disorder (manic depression), and major depressive disorder. http://www.drugs.com/seroquel.html.

[8]Plaintiff's divorce lawyer provided this letter to the family court in an effort to have maintenance payments continue due to plaintiff's disability. (Tr. at 252.)

7

settlement agreement from her divorce.  She had not needed Seroquel for sleep.  Her primary doctor had provided Klonopin,[9] which had been very helpful.  She appeared euthymic, calm, and well groomed.  Dr. Kirkwood continued Lamictal, Effexor, and Klonopin.  (Tr. at 303.)

On September 4, 2007, plaintiff returned to Dr. Thompson.  Her divorce was finalized, and she was content with the outcome of the settlement.  She was beginning to calm down and realized the need to work on some individual concerns including boundary setting and recovering from emotional abuse.  Her affect was euthymic, and she seemed aware of her issues and options.  (Tr. at 303.)

During her September 11, 2007, session with Dr. Thompson, plaintiff continued processing thoughts about the divorce, saddened by the loss of friends but also amazed at the support from near strangers.  Her affect was mainly bright, and she showed some good insights.  (Tr. at 304.)

On September 18, 2007, plaintiff told Dr. Thompson,"I'm doing so much better."  (Tr. at 304.)  Her mood had improved and she was ready to work on settling into her new home and life.  Dr. Thompson did discover symptoms of obsessive compulsive disorder ("OCD") and a history of eating disorder.  (Tr. at 304.)

In a September 18, 2007, assessment form, Dr. Thompson listed clinical impressions of rule out bipolar, rule out adjustment disorder with mixed depressed and anxious mood, and rule out OCD, with a current GAF of 60.[10]  (Tr. at 299.)  Plaintiff was to continue in therapy to

---

[9]Klonopin (clonazepam) is used to treat seizure disorders or panic disorder. http://www.drugs.com/klonopin.html; see also note 18, infra, and accompanying text.

[10]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning.  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a

8

improve mood and coping. (Tr. at 300.)

On September 25, 2007, plaintiff saw Dr. Thompson, worried about going broke trying to help her kids and friends. Her affect was euthymic, and she reported feeling better overall. Dr. Thompson reinforced that plaintiff does not need to compete with her ex-husband over the kids. (Tr. at 304.) Plaintiff canceled her October 1 session with Dr. Kirkwood because she was sick. (Tr. at 305.)

On October 11, 2007, plaintiff advised Dr. Thompson that she had decompensated after her boyfriend went to jail for drunk driving, going on a drinking binge and gambling large sums of money. She was not sleeping much and had racing thoughts. Dr. Thompson encouraged plaintiff to contact Dr. Kirkwood regarding her manic symptoms. (Tr. at 291.)

At her October 15, 2007, session with Dr. Thompson plaintiff continued to struggle with intense fears about being alone. Drinking and gambling provided an outlet for her anger and relieved her anxiety. (Tr. at 291.) On October 29, she seemed to be doing better, with no gambling and euthymic effect. She was also able to joke about a property dispute with her ex-husband. (Tr. at 292.) However, on November 6, plaintiff advised Dr. Thompson that she had gambled and lost more money. She believed some of her gambling was a passive-aggressive expression of anger against her ex-husband but realized it only hurt her. Her affect was a bit strained, and she seemed frustrated with herself. (Tr. at 292.) On November 14, plaintiff advised Dr. Thompson that her boyfriend was out of jail, and his company reduced her fears. (Tr. at 292.) On December 4, plaintiff told Dr. Thompson she had been getting along well with

persistent danger of hurting herself or others. Scores of 61-70 reflect "mild" symptoms, 51-60 "moderate" symptoms, and 41-50 "severe" symptoms. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

9

her boyfriend, though she was concerned about his drinking. (Tr. at 293.) Plaintiff missed her session on December 11, 2007, and canceled on January 8, 2008. (Tr. at 293.)

On January 22, 2008, plaintiff saw Dr. Kirkwood, denying suicidal ideation but still complaining of low energy. Her mood was overall better, and she was getting along better with her kids. She was looking forward to her daughter's wedding in May and wanted to have a job by then. She reported her manic episode a few months ago, drinking and gambling. Dr. Kirkwood continued Lamictal and Effexor. (Tr. at 293.)

On April 12, 2008, plaintiff called St. Agnes requesting a refill of Effexor. (Tr. at 294.) On May 5, plaintiff called complaining of increased depression and no insurance. She wanted to change to generic medications. Dr. Kirkwood indicated that plaintiff had to be seen to change medications. (Tr. at 294.) On May 19, plaintiff requested a letter excusing her from jury duty because she did not feel able to participate. (Tr. at 286.)

On May 21, 2008, plaintiff saw Dr. Kirkwood, reporting that she kicked her abusive boyfriend out one week ago. She also indicated that she was smoking marijuana daily due to fibromyalgia pain. She had a tearful, dysphoric affect, but was able to smile/joke appropriately. (Tr. at 287.) Dr. Kirkwood reduced Effexor, added Celexa,[11] and continued Lamictal, and recommended no drinking or marijuana use. (Tr. at 287-88.)

On August 8, 2008, plaintiff was a no call, no show for her appointment with Dr. Kirkwood. As a result, she was discharged. (Tr. at 290.)

### b. Fond du Lac Psychiatry

Between December 11, 2008 and January 27, 2011, plaintiff saw Jeffrey Junig, Ph.D.,

---

[11]Celexa (citalopram) is used to treat depression. http://www.drugs.com/celexa.html.

10

at Fond du Lac Psychiatry. (Tr. at 325-31.) These treatment notes are handwritten and difficult to decipher.

The December 11, 2008 intake note states that plaintiff presented with a chief complaint of chronic pain/anxiety. She talked loud and fast, and appeared depressed and tearful. (Tr. at 326.) She reported being at the breaking point due to accumulated stessors. Dr. Junig appears to have assessed mood disorder, rule out bipolar disorder, with a GAF of 50. He continued medications including Celexa. (Tr. at 327.)

On January 7, 2009, plaintiff reported having the flu and stopped many of her medications. It appears that Dr. Junig adjusted her medications. (Tr. at 328.) On March 4, 2009, plaintiff reported feeling much better, off narcotics completely. She reported that her pain was slowly improving on Cymbalta.[12] (Tr. at 328.) On May 27, 2009, plaintiff complained of severe shoulder pain. Flexeril was helpful.[13] (Tr. at 329.) On January 6, 2010, plaintiff reported drinking more. (Tr. at 329.) On June 24, 2010, she continued to complain of pain but was not taking pain medications, working on spirituality instead, stating: "Feels great to be clean." Her mental status was euthymic, upbeat. (Tr. at 330.)

However, on January 27, 2011, plaintiff reported "falling apart." (Tr. at 330.) Her ex-husband was trying to get full custody of their daughter. She was drinking more and insisted that she needed alcohol to numb the pain in her back. Dr. Junig pointed out how much better she had done when sober. (Tr. at 330.) Plaintiff asked for help with pain, and Dr. Junig told her she must stop drinking first. He offered to refer her to treatment, but she said she could

---

[12]Cymbalta (duloxetine) is used to treat major depressive disorder, general anxiety disorder, and fibromyalgia. http://www.drugs.com/cymbalta.html.

[13]Flexeril (cyclobenzaprine) is a muscle relaxant. http://www.drugs.com/flexeril.html.

11

stop on her own. (Tr. at 331.)

### c. ThedaCare Behavioral Health

From April 28, 2011, to July 13, 2011, plaintiff saw Sandy Mittlesteadt, MSE, at ThedaCare Behavioral Health, for counseling. (Tr. at 382.) At the initial evaluation on April 28, plaintiff reported symptoms of difficulty sleeping, feelings of worthlessness, crying spells, low self esteem, sadness, trouble concentrating, irritability, and poor self-care. (Tr. at 387-88.) On mental status exam, she was dressed appropriately, with appropriate psychomotor status, moderately depressed mood with consistent affect, normal thought content, good insight, and intact judgment. Mittlesteadt diagnosed major depressive disorder, recurrent, and anxiety disorder, with a current GAF of 65 (Tr. at 390), planning weekly counseling (Tr. at 391).

On May 24, 2011, plaintiff reported a decrease in her symptoms since her last session. (Tr. at 385-86.) However, she was not able to obtain and maintain employment due to physical and mental health issues. Her mood was anxious, her attitude cooperative, and her affect appropriate. She continued to make good progress, to follow up in two weeks. (Tr. at 386.)

On July 13, 2011, plaintiff again reported decreased symptoms since her last session. She was working on setting boundaries but continued to have panic attacks daily. Her mood was anxious, attitude cooperative, affect appropriate, with no suicidal ideation. She was to follow up in four weeks. (Tr. at 384.)

According to the August 23, 2011 discharge note, plaintiff arrived with many family stressors. She attended three sessions sporadically and did not comply with the treatment plan. (Tr. at 382.) She was discharged after she no-showed twice. Her diagnosis on discharge was major depressive disorder, recurrent, with a GAF of 60. (Tr. at 383.)

### d. Fond du Lac County

From January 5, 2012, to February 1, 2013, plaintiff saw Espen Klausen, Ph.D., through Fond du Lac County, on referral after a crisis contact. (Tr. at 409-18.) At the initial assessment on January 5, plaintiff reported anxiety, panic attacks, emotional and impulsive decision making, and emotional flashbacks. She reported being very ill emotionally, physically, and spiritually. She also reported significant alcohol problems, sober the last two months. (Tr. at 414.) She reported cycling a lot, not sleeping for three days then sleeping a lot for three days. She indicated that she generally cycled two weeks manic with little pain and two weeks depressed with significant pain. During the interview, she was collected, rational, and constructive, but reported that she was usually not that way. (Tr. at 415.) Dr. Klausen planned cognitive behavioral therapy (Tr. at 416), diagnosing post-traumatic stress disorder, chronic; bipolar disorder, rapid cycling; alcohol dependence, in early remission; marijuana abuse; dependent personality disorder with strong borderline or obsessive-compulsive traits; and a GAF of 52 (Tr. at 417).

On January 25, 2012, plaintiff reported that she left the acute unit the previous day, having hospitalizing herself after she smoked some pot and was afraid it may have been laced with something. Dr. Klausen provided techniques for relaxation and countering her hoarding issues. She was fairly rational with the therapist, responsive and eager to learn. They would continue working on ways to cope with her anxiety. (Tr. at 413.)

On February 29, 2012, they again worked on relaxation techniques. Plaintiff was able to be collected, rational, and pragmatic while with the therapist. They would continue to work on becoming more fully aware of how her mental processes work and how to stay pragmatic. (Tr. at 412.)

13

On March 13, 2012, plaintiff reported a difficult past couple of weeks. She described herself as having multiple personalities and having a hard time bringing out the ones she wanted. Dr. Klausen "did significant restructuring with her to reduce the fractioning of her personality. [Dr. Klausen] talked with her, in particular, about how, at any given time, we have multiple views, opinions, and desires, and it is important not to fracture these out as being different people." (Tr. at 411.) As the session moved on, her sense of herself became less fractious. Dr. Klausen indicated that plaintiff "displays tendencies towards a dissociative identity disorder. Her ability to dissociate is not questioned. Her sense of herself of having distinct personalities, however, seems to be somewhat self-created and appears somewhat amenable to restructuring." (Tr. at 411.) They would continue to work on reducing her sense of split personalities and working through her fear hierarchy. (Tr. at 411.)

On April 27, 2012, plaintiff reported a hard time in a group session, indicating she shut down and became very anxious when they challenged her on excuse making. She was starting to see an "ASTOP"[14] worker and was also seeing an AODA counselor. She was very responsive but seemed to be struggling some recently. (Tr. at 410.)

On May 9, 2012, plaintiff reported difficulty after she met an abusive ex-boyfriend. They continued to work on processing things in more structured ways. (Tr. at 409.)

On September 5, 2012, plaintiff reported being taken advantage of by someone from her AA group. She reported that she had not been drinking and had been trying to channel herself into work. She was very responsive. They would do assertiveness training together.

---

[14]ASTOP, which stands for "Assist Survivors Treatment Outreach Prevention," is a program for sexual assault survivors in which plaintiff participated from February 2012 to January 2013. (Tr. at 536.)

14

(Tr. at 520.)

On October 30, 2012, plaintiff reported that she had a very difficult time since she was on Prozac. She was not currently on any medication. They discussed principles to use in dealing with her hoarding. She continued to have a lot of anxiety but was very responsive. They would continue to work on managing anxiety. (Tr. at 519.)

On January 14, 2013, Fond du Lac County administratively closed plaintiff for psychiatric services. The note, authored by Natalie Krah, M.D., indicated that plaintiff was last seen for a psychiatric appointment on July 18, 2012, with Dr. Musunuru. She was last seen by Dr. Krah in 2011. She no-showed for an appointment with Dr. Cannon in 2012. She had been tried on various anti-depressant medications and mood stabilizers with limited success, and she was judged not to be a candidate for further medications. However, she did make improvements in her ability to confront her anxiety and deal with life. The note concluded: "Ms. Majerus continues to have a lot of anxiety and having a hard time dealing with posttraumatic symptoms in her daily life, but it is thought that she can best treat these difficulties through outpatient mental health services." (Tr. at 518.)

On January 17, 2013, plaintiff called Dr. Klausen, reporting a lot of stress. She indicated she lost her job and had a shoulder injury. She was moving in with her grandmother in Washington County. She reported more episodes of losing track of where she was, which would be consistent with past trauma being triggered. She also reported being very nervous lately. However, she had learned a lot that helped her cope and reported she made a lot of progress. She asked for a recommendation for a therapist in Washington County. (Tr. at 517.)

On February 1, 2013, plaintiff discharged from therapy with Dr. Klausen based on her move out of Fond du Lac County. In the discharge note, Dr. Klausen noted progress making

15

pragmatic choices and reducing anxiety levels, although she continued to report panic attacks and flashback episodes. Due to her responsiveness to cognitive behavioral therapy, Dr. Klausen recommended that she seek a therapist in Washington County where she would be living. (Tr. at 516.)

### e. Washington County

On April 24, 2013, plaintiff started seeing Stefanie Johnson, LPC, through Washington County. In a June 3, 2013, letter, Johnson indicated that she had seen plaintiff four times. Johnson reported that plaintiff had a significant trauma history, as a result of which her personality had separated into several different parts. She had been given a diagnosis of dissociative disorder. Plaintiff could identify 13 obvious parts that had nicknames and stated that there were more parts that she could not identify by name at the time. She was able to tell the ages of some of the parts (e.g., "3 year old self"), which seemed to coincide with a traumatic incident that occurred around that same age. She reported becoming aware of her parts about 1-½ years ago after she became sober. She began working with a psychologist who helped her build this awareness and begin the process of integrating her parts. Plaintiff also carried diagnoses of bipolar disorder and PTSD, per history. She engaged in high risk behaviors at times, engaged in self-injurious behaviors, and had a history of eating disorder per her report. The different parts of her personality made it difficult for her to work in a high pace, high stress environment if the part of her personality that was prominent was unable to perform her job tasks. Johnson concluded: "It is my professional opinion that Debra's significant mental health issues make it very difficulty for her [to] maintain a full-time job to fully be able to support herself at this time. Debra will need further psychotherapy and continued work integrating the parts of her personality in order for her to be successful in the workforce." (Tr. at 537.)

16

## 2.    Physical Health Treatment

On September 19, 2006, plaintiff saw Dr. Mark Whitmore, her primary physician, with pain complaints. Dr. Whitmore assessed myofascial pain, symptoms of cervical radiculopathy, possible psychological amplification, and poor work tolerance. Dr. Whitmore indicated that plaintiff's ability to do physical work appeared somewhat limited; she was looking for light work or a desk job and so far had not been able to find one. He prescribed a Lidocaine patch, ordered an MRI of the cervical spine, and recommended she try Flexeril.[15]  (Tr. at 501.)

On October 2, 2006, Dr. Whitmore noted that the MRI of the cervical spine came back negative. On exam, plaintiff had mild trigger points. He assessed myofascial pain in a pattern similar to fibromyalgia, indicating that she could gradually increase physical activity, including some type of aerobic exercise, and continue to use Flexeril. (Tr. at 500.)

On March 27, 2007, plaintiff saw Dr. Jeanna Owens, a rheumatologist, for probable fibromyalgia. She reported pain up and down the entire right side of her body, worse the past year with the stress of her divorce. (Tr. at 502.) Dr. Owens assessed fibromyalgia and depression, under treatment. (Tr. at 503.) She saw no evidence of arthritis. They discussed the relationship of sleep, stress, and depression to fibromyalgia. The emphasis should be on treating the depression, reducing stress, and improving her sleep, best coordinated through her psychiatrist. Dr. Owens indicated that it seemed unlikely plaintiff would have complete relief of pain with even a concentrated approach for her fibromyalgia given the length of time her

---

[15]In September 2006, Dr. Whitmore drafted a letter indicating that "it is my opinion that she is not going to be able to do hard physical labor, and medium labor on an ongoing, 40 hour per week basis, will also be a significant problem as well. I do believe that she can do light physical work and desk work for 8 hours a day, although there will probably be some intermittent absences that are pain related." (Tr. at 254.)

17

symptoms had been present. However, if some of her stresses could be resolved and her depression treated and sleep restored, she could be more comfortable and functional. (Tr. at 504.)

In May of 2007, plaintiff received physical therapy ("PT") for sacroiliac ("SI") joint pain. Plaintiff reported that on May 7 she was doing her morning stretches and felt a pop in her low back/buttocks region. She reported that she had this problem before, and that she had PT about two to three years ago. She was currently seeing a chiropractor for her neck and her SI joint, and had used ice, pain medications, and had been to the pain clinic previously. She reported difficulty getting dressed, sitting, driving, doing any form of transfers, and preferred to lie down. She had been taking Ibuprofen two to three times per day but had been doing this for about 20 years because of chronic pain. She had been seen in urgent care on May 7, to follow up with Dr. Whitmore. She also reported increased neck pain the last couple days, but the PT orders were limited to the SI joint. Plaintiff reported normally walking about one mile per day. At rest, her pain was 3 to 4/10; with activity, 7 to 9/10. She reported burning pain in the buttocks area, shooting down the right leg. (Tr. at 316.) On exam, she had full range of motion except trunk extension, intact sensation, and 5/5 lower extremity strength except for right hip flexion 4/5. She had tenderness in the right gluteal region up into the mid-thoracic region of the spine, negative straight leg raise bilaterally, and negative spring test for SI. She was instructed on flexibility exercises and also received cryotherapy to the lumbar gluteal region. Her prognosis was noted to good. (Tr. at 317.) Her goals were to be independent with a home exercise program and have full active range of motion of the trunk region. She was to be seen twice per week for four to five weeks. (Tr. at 318.)

Plaintiff was seen three times – on May 16, 21, and 23 – no showing for a fourth session

18

on May 30. At the third session on May 23, she reported feeling better, rating her pain 3/10. (Tr. at 314-15.) According to the June 20, 2007, discharge note, plaintiff was seen for a total of three visits, missed her May 30 session, and did not call to make more sessions. Overall, she had increased tolerance to exercise. She was discontinued secondary to not calling to make more appointments. (Tr. at 319.)

On July 3, 2007, plaintiff saw Dr. Whitmore, reporting increased neck and shoulder pain, as well as pain down her right leg. She also reported increased psychiatric stressors related to her divorce. On examination, she was anxious and tearful. She was not excessively tender, but she stated that she was having less pain at the moment than average. Dr. Whitmore assessed fibromyalgia and myofascial pain syndrome, depression, significant psychological amplification of pain, and possible sleep apnea. Dr. Whitmore indicated that sleep might help her pain, so he prescribed Percocet to be used at bedtime.[16] He did not believe her to be narcotic seeking in the usual sense. At the same time, he believed that getting her relief of her symptoms was going to be extraordinarily difficult. He indicated that additional pain clinic referrals would be of marginal utility until she got through the latest psychological stressors. He cautioned her to avoid alcohol, and she reported rarely drinking. (Tr. at 260.) She was to return in three months. (Tr. at 261.)

On August 13, 2007, plaintiff returned to Dr. Whitmore, reporting that she had been seen in the emergency room for back pain. She had been sitting and suddenly had severe pain in

---

[16]Percocet contains a combination of acetaminophen and oxycodone. Oxycodone is an opioid pain medication (sometimes called a narcotic). Acetaminophen is a less potent pain reliever that increases the effects of oxycodone. Percocet is used to relieve moderate to severe pain. http://www.drugs.com/percocet.html.

19

her back. She was given Darvocet[17] and Flexeril. She admitted that she was a "basket case" with stress and anxiety related to her divorce. She had seen her chiropractor, and her back was little better. She had a history of myofascial pain and right sciatica. She had extensive evaluations in the past, and it was felt by multiple providers that she had some degree of myofascial pain and multiple somatic disorders with unclear etiology and probably significant psychological overlay. On exam, she was anxious. She had tenderness of the left low back without typical trigger points and without classic excessive tenderness of fibromyalgia. Dr. Whitmore's impression was back pain with myofascial component in a patient with a history of atypical pain problems. On a short-term basis, he provided the anti-anxiety medication Clonazepam,[18] and continued Flexeril. He did not feel she was a good candidate for chronic or large doses of narcotics. (Tr. at 262.)

On October 3, 2007, plaintiff saw Dr. Whitmore complaining of a cough. She also complained of a rash and was on Lamictal. She had nausea and vomiting for about a week, but this was better. Dr. Whitmore assessed viral bronchitis, improving, and atypical rash, not classic for a drug rash. In view of the severity of the rashes that can occur with Lamictal, Dr. Whitmore requested a dermatology consult; given the good results plaintiff had with Lamictal, he believed it might be problematic to change it. He provided a cream and Benadryl. (Tr. at 264.)

---

[17]Darvocet contains a combination of propoxyphene and acetaminophen. Propoxyphene is a narcotic pain reliever. As indicated in note 16, supra, acetaminophen is a less potent pain reliever that increases the effects of propoxyphene. Darvocet is used to relieve mild to moderate pain with or without fever. http://www.drugs.com/darvocet.html.

[18]As indicated in note 9, supra, Clonazepam (Klonopin) is used to treat seizure disorders or panic disorder. http://www.drugs.com/clonazepam.htm.

20

On February 20, 2008, plaintiff returned to Dr. Whitmore, complaining of back pain for four days. She also had fibromyalgia but overall got by on stretching, non-steroidal medication, and Lyrica. Her psychiatric situation was better. On exam, she had palpable trigger points in the paraspinal muscles and medial to right lower scapula. She did seem to be in a lot of pain. Dr. Whitmore assessed mysofascial pain with trigger points and prescribed Percocet, to be used sparingly for flares such as this and not for ongoing day to day pain. (Tr. at 266.)

On September 5, 2008, plaintiff saw Dr. Juan Albino for evaluation of mid-back and right shoulder pain. Plaintiff reported pain for many years, dating back to a childhood tumor removal surgery, with transient relief from injections, and use of numerous pain medications, with only Percocet helping. A trial of Lyrica had helped in the past. She also reported psycho-social issues and had a hard time giving a history as she was crying and anxious. She stated that at the moment the only thing she was using for pain was alcohol. (Tr. at 505.) She indicated that she sometimes needed alcohol to get her pain under the control in the morning; she also drank in order to sleep. She denied weakness in the upper extremities. She displayed significant pain behavior, and exam was limited because of her emotional status, although her gait was observed to be steady. There was no evidence of swelling or edema of the upper extremities. She had severe tenderness to palpation of the lumbar region and severe muscle spasm involving the trapezius on the right side. Range of motion of the right shoulder and upper extremity was functional, as was her neck, although neck extension caused severe exacerbation of her symptoms. (Tr. at 506.) Based on history and limited examination, Dr. Albino suspected intercostal neuritis with a myofascial component. The goal was to find her a psychiatrist to get her bipolar disorder under control. He also wanted to get her pain under better control to do a more comprehensive physical examination; for this, he prescribed Lyrica,

21

a topical containing lidocaine, Percocet, and Flexeril.  (Tr. at 507.)

On September 17, 2008, plaintiff followed up with Dr. Albino, reporting some pain relief with the medications.  She appeared in less distress, more alert, and more cooperative, and denied medication side effects.  On exam, her right shoulder subacromial space was tender, as well as the bicipital tendon region.  Range of motion of both upper extremities was within functional limits, as well as her neck.  She displayed some weakness of the right upper extremity and shoulder impingement test was positive.  (Tr. at 508.)  Dr. Albino administered a right subacromial joint injection as well as trigger point injections to the right levator scapula and trapezius muscle.  He also prescribed Percocet and highly encouraged her to find a psychiatrist to follow up on her bipolar disorder.  (Tr. at 509.)

On October 15, 2008, plaintiff returned to Dr. Albino, reporting that the injection helped initially but after a couple days there was no significant improvement in her symptoms.  She had seen a psychiatrist, who prescribed Ambien,[19] Lamictal, and Celexa.  She reported that she quit drinking, and her pain was now worse.  She reported that the Lyrica was helping, but she ran out and did not ask for a refill.  (Tr. at 510.)  She had significant crepitus of the right shoulder on range of motion, otherwise functional range of motion with evidence of impingement on shoulder abduction.  There was still a myofascial component on the right cervical dorsal muscles near the shoulder blade scar.  She denied any symptoms radiating into the right upper extremity.  Dr. Albino provided a prescription for a TENS unit, referred her to occupational therapy for evaluation and treatment, and restarted Lyrica, with Percocet for break-through pain.  Dr. Albino concluded that the etiology of her condition was complex, a

---

[19]Ambien (zolpidem) is used to treat insomnia.  http://www.drugs.com/ambien.html.

combination of a myofascial component on the right cervical dorsal muscles and some degenerative changes in the right shoulder. (Tr. at 511.)

On October 23, 2008, plaintiff saw Sharon Duchateau, OTR, for an occupational therapy evaluation, on the referral from Dr. Albino. (Tr. at 268-69.) Plaintiff reported that her entire right side was very painful. (Tr. at 268.) On objective evaluation, bilateral upper extremity range of motion and strength were within normal limits. Head/neck range of motion were within functional limits with complaint of pain and tightness on the right side. She also complained of pain and numbness over the right ulnar nerve. She presented with bilateral trigger points in several areas. She was extremely labile, reporting no medications for the last two days. She had a great deal of treatment in the past, questionable in terms of compliance but verbalized a desire to become independent with self-care and decrease her dependence on pain medication. She was to be seen once per week for 10 weeks in occupational therapy to address these goals. (Tr. at 269.)

On October 27, 2008, Duchateau instructed plaintiff on ischemic compressions and stretches. Plaintiff felt releases in her back and right shoulder and verbalized enthusiasm to learn self-care methods for pain management. (Tr. at 512.)

However, on November 5, 2008, plaintiff arrived for therapy very labile, crying uncontrollably, stating that nothing was working, and she could no longer tolerate the pain. She was concerned about going back to alcohol and indicated she should be admitted to the hospital for an extended period of time for observation to try to figure out her pain. Duchateau spoke to Dr. Albino, and they agreed that it would be in plaintiff's best interest to go to a pain psychiatrist. Plaintiff left in frustration, and the therapist confirmed she was not in danger of harming herself. She was discharged from occupational therapy. (Tr. at 513.)

23

On November 26, 2008, plaintiff saw Dr. Albino for follow up, looking better than previous visits. She still complained of pain in her right shoulder region but not as bad as before. She had quit drinking and was tapering down her use of Percocet. She was taking Lyrica, which helped her significantly; she denied any side effects. The topical cream also helped her to a great extent, without side effects. She also reported seeing a psychotherapist, which helped her, and a psychiatrist, Dr. Edward Dy. She did seem less anxious. Dr. Albino believed her psychiatric issues played an important role in her chronic pain condition. On exam, she was in no acute distress and displayed no overt pain behavior. Range of motion of the right shoulder remained within functional limits. Palpation showed some tenderness and myofascial dysfunction as well as trigger points in the rhomboid muscles and the subscapular muscle region. (Tr. at 514.) Dr. Albino noted a positive drug screen, and plaintiff admitted using marijuana before she signed a controlled substances agreement with him. Dr. Albino indicated he would perform unannounced drug screens, and if he found any illicit drug use he would no longer be able to give her narcotics. He also changed her Percocet, which she said was too strong, to Vicodin,[20] and switched her from Flexeril to Zanaflex.[21] She was to continue Lyrica. He also provided Xanax, which previously helped her anxiety.[22] (Tr. at 515.)

On December 23, 2008, plaintiff was seen in the emergency department, vomiting since December 18, feeling light headed and feverish. (Tr. at 275.) She felt better after two liters of

---

[20]Vicodin, a combination of acetaminophen and hydrocodone, is used to relieve moderate to severe pain. http://www.drugs.com/vicodin.html.

[21]Zanaflex is a short-acting muscle relaxer. http://www.drugs.com/zanaflex.html.

[22]Xanax (alprazolam) is used to treat anxiety disorders, panic disorders, and anxiety caused by depression. http://www.drugs.com/xanax.html.

24

intravenous fluids and Zofran.[23]  Her abdominal exam improved after she stopped vomiting, and a CT and labs were unremarkable.  She was discharged home with Zofran.  (Tr. at 278.)

The notes then skip ahead three years, to September 19, 2011, when plaintiff was seen in urgent care with complaints of what she thought were large lymph nodes.  On exam, Dr. Scott Stellmacher noted slightly prominent lymph nodes, but lab work was normal.  She was referred to general surgery for further evaluation.  (Tr. at 398-99.)

On December 29, 2011, plaintiff was seen in the emergency department presenting with depression.  She reported that she "flipped out" during an AA meeting when she heard news of a member who was going to die.  She was now afraid of what she was going to do with herself.  (Tr. at 403.)[24]

On February 1, 2012, plaintiff went to the emergency room complaining of generalized weakness and tremors.  She was trying to relax but became very anxious and tremulous, and began to develop tingling in her hands and feet.  She reported being taken off Cymbalta 10 days ago by a Dr. Whelan.  (Tr. at 404.)  Assessed with anxiety and paresthesias, her condition improved, and she was discharged home with friend.  She was to follow up with her psychiatrist, Dr. Krah.  (Tr. at 408.)

### 3.     Vocational Evidence

On August 23, 2007, plaintiff underwent a vocational assessment with Dana Beining, MS, in connection with her divorce proceedings.  (Tr. at 524-30.)  Beining noted that plaintiff completed high school, one additional year of technical college, and course-work for Certified

---

[23]Zofran (ondansetron) blocks the actions of chemicals in the body that can trigger nausea and vomiting.  http://www.drugs.com/zofran.html.

[24]The transcript appears to contain only one page from this visit.

Nursing Assistant. (Tr. at 526-27.) More recently, she participated in a training program in real estate but had to quit due to the cost and travel. Regarding her vocational history, for approximately 23 years, plaintiff participated in the running of the family dairy farm, which included managing the books, assisting with cleaning and upkeep of the barns and equipment, and some assistance with crops. From December 2004 to July 2005, plaintiff worked at a nursing home, leaving because the physical nature of the job caused back pain. She then worked in telephone sales for about two months, work she could tolerate but which she left when hired as a bank teller. As a teller, she enjoyed the customer interaction, as well as working with money and reports. However, after about seven months, she was fired for missing too many days due to illness. (Tr. at 527.) After a brief period of unemployment, she worked as a car salesperson, but the long shifts pushed her past her limits, and she fell ill with pneumonia. (Tr. at 527-28.) She held this job for two months between May and July 2006 before quitting due to stress and illness. From August to October 2006, she worked assisting customers and stocking shelves at a meat market. Being on her feet and performing a significant amount of reaching caused shoulder and back pain. She changed to part-time status, then left for a clerical job at a state prison, which she held from October 2006 to March 2007. This type of work seemed to agree with her, but she was terminated due to absences and mistakes relating to concentration issues. (Tr. at 528.)

In terms of skills, plaintiff reported the ability to navigate the internet and use e-mail systems. She could also operate many of the Microsoft office programs, such as Word and Excel. She also had the knowledge to operate various pieces of office equipment and bookkeeping abilities. (Tr. at 528.) On testing, she performed at the post high school level for both reading and arithmetic. (Tr. at 528-29.)

26

Based on her history and skills, plaintiff appeared to have a number of attributes to lend to a job search and employment. However, Beining saw a number of barriers that would make plaintiff's consistent and practical reentry into the labor market possible "but not probable." (Tr. at 528-29.) Beining quoted an August 18, 2007 report from Dr. Whitmore, which indicated that plaintiff:

> will not be able to handle heavy physical labor, and moderate labor all day is also something she would not be able to tolerate. The patient physically should be able to tolerate desk work, although her endurance may be somewhat limited and intermittent absences for various health problems, some of which will be pain related, could be anticipated.

(Tr. at 526.) Beining also quoted an August 23, 2007 report from Dr. Kirkwood, which sated that plaintiff:

> is unable to work in any capacity at this time due to her mental illness. I hope that with continued medication adjustments and psychotherapy, she will be able to work a low stress position in the future. She will not likely be stable enough to do so for at least several months.

(Tr. at 526.)

Beining considered the recommendations of plaintiff's treating physicians in relation to her vocational alternatives. Beining noted Dr. Whitmore's opinion that plaintiff may experience absences related to her impairments, which was also reflected in plaintiff's statements regarding "good" and "bad" days and in plaintiff's work history, with no employment lasting longer than eight months, and most employment being terminated due to illness or pain related absences. "Given the fast paced, detailed nature of many clerical positions, it is not likely that companies would be able to accommodate these absences." (Tr. at 529.) Beining concluded:

> I believe that Ms. Majerus has the ability to represent herself and her skills appropriately during what she terms a "good day" in order to obtain employment. However, given her current physical complaints and psychological and emotional concerns, it is not likely that she will be able to maintain it. This fact is further

27

emphasized by Dr. Kirkwood in the correspondence of 8/23/07, indicating that Ms. Majerus is not employable in her current condition.

Similarly, her current work history shows brief employment efforts, which may cause concern with many employers. Therefore, she may be relegated to low-skill or secondary labor market positions where employee turnover is not uncommon. These types of positions typically will not fit the medically endorsed restrictions. Therefore, it is my opinion that Ms. Majerus is currently not employable.

(Tr. at 529-30.)

## C.    Procedural History

### 1.    Plaintiff's Application and Supporting Materials

On February 24, 2011, plaintiff applied for disability insurance benefits, alleging that she became disabled as of June 30, 2007.[25]  (Tr. at 161, 185.)  In her disability report, plaintiff listed a variety of conditions, including back pain, depression, fibromyalgia, migraines, IBS (irritable bowel syndrome), TMJ (temporomandibular joint disorder), rheumatoid arthritis, bulging discs, bipolar disorder, memory problems, and concentration problems.  She indicated that she stopped working because of these conditions in March 2007.  (Tr. at 189.)  She listed past employment as a bank teller, cashier in a meat market, office assistant in a prison, phone operator for a tele-service center, and in auto sales.  (Tr. at 190.)

In her function report, plaintiff described a typical day.  She would take Ibuprofen while still in bed, then surf the internet for 30 minutes to one hour waiting for it to work.  She would then do dishes, shower if she had the energy, make a meal, and try to keep up with bills.  She indicated that she had one to two hours to get errands done before she was in too much pain

_____

[25]In the application, plaintiff stated that she became disabled on March 1, 2007 (Tr. at 161), but the disability report lists an onset date of June 30, 2007 (Tr. at 185); the ALJ used the latter date (Tr. at 24).  Plaintiff also applied for supplemental security income (Tr. at 168), but that application was denied because she failed to satisfy the SSA's means test (Tr. at 97).

28

to continue. She wrote that some days she could think, other days not at all. She reported having little stamina and low tolerance for stress. She did stretches throughout the day to try to relieve spasms. (Tr. at 195.) She indicated that pain interfered with dressing, bathing, and fixing her hair. (Tr. at 196.) She wrote that she sometimes prepared meals – sandwiches, casseroles, and frozen dinners. She did dishes, some laundry, dusted, swept, and cleaned the toilets and sink. (Tr. at 197.) She did not do yard work because she was allergic to grass. She went out almost every day. (Tr. at 198.) She listed hobbies of sewing, fishing, camping, walking, and spending time with her children and grandchildren. She reported fishing once or twice per month, camping once or twice per year, walking several times per week, and seeing her kids weekly; she could no longer quilt. She went to her daughter's sports events two to three times per month. (Tr. at 199.) She indicated that she could walk one or two miles before she had to rest for 15 minutes. She could pay attention 0-15 minutes, could not finish what she started, and got mixed up trying to follow written instructions. Her ability to follow spoken instructions varied depending on her pain level. (Tr. at 200.) Asked how well she got along with authority figures, plaintiff wrote that her patience level had depleted significantly in the past decade. She indicated that she could handle almost no stress and dealt with changes in routine horribly. (Tr. at 201.)

In a physical activities addendum, plaintiff indicated that she could continuously sit for one hour, stand for 15 minutes, and walk one or two miles. In a day, she could sit for four or five hours, stand for three to five hours, and walk for two or three hours. Her doctors had not limited the amount of weight she could lift. She indicated that she had lost jobs because of her conditions because she was unable to concentrate, took too many sick days, could not complete tasks fast enough, made too many mistakes, and was forgetful. (Tr. at 203, 212.)

29

In a subsequent disability report, plaintiff indicated that her condition had worsened. She had redeveloped ulcers, which caused pain just below the chest area to the point where she could not eat. She also reported worsening pain all over the right side of her body. She further reported bad memory, poor concentration, and forgetting a lot. She indicated that she was to the point where she had trouble even taking care of herself. Finally, she wrote that she feared going out in public alone, feared people were judging her, was always looking over her shoulder, and did not like being around people. (Tr. at 215.)

In a further disability report, plaintiff reported more pain all over her body. She also reported lumps on her neck and high blood pressure. She suspected that she had a mini-stroke. She reported lack of memory for simple things, lots of headaches, and terrible anxiety attacks. She reported crying spells and ups and downs in her mood. (Tr. at 225.) She also reported pain when putting on clothes, jaw pain when eating, and going days without grooming herself. (Tr. at 229.)

## 2.    Agency Review

On June 7, 2011, Robert DeYoung, Ph.D., conducted a psychological evaluation for the agency. Asked for the primary reason she could not work, plaintiff responded that she had PTSD, with terrors from various triggers; she also had depression, back pain, fibromyalgia, TMJ, and migraines. (Tr. at 335.) On mental status exam, her communication skills appeared within normal limits, she was fairly well groomed, dressed casually but appropriately. She did not manifest significant evidence of psychomotor agitation or retardation. During the interview, she was reasonably cooperative but quite emotionally labile, crying and laughing easily. Affect was varied but appropriate to the emotions she was experiencing. She reported some vegetative symptoms of depression, including sleep problems, irritability, and crying spells.

30

She denied current suicidal thoughts. Stream of mental activity appeared within normal limits. She was reasonably well oriented and did not manifest significant memory problems. She was able to recall past events quite well. She had some difficulty with recent memory as she was able to recall all items immediately but only one of three after five to ten minutes. Immediate memory appeared within normal limits, as she was able to recall seven digits forward and five digits backwards. She manifested mildly limited fund of knowledge. Concentration appeared within normal limits. She had no difficulty following a three-step command and no difficulty following conversation. (Tr. at 337.) She had some insight regarding her current difficulties, and judgment appeared within normal limits. (Tr. at 338.) On psychological testing, her memory functioning was seen as at the average to slightly above average level. (Tr. at 339.)

Dr. DeYoung diagnosed adjustment disorder with depressed mood, post-traumatic stress disorder, alcohol abuse in partial remission, pain disorder associated with psychological factors and general medical condition, and personality disorder not otherwise specified with borderline and histrionic features, with a current GAF of 55, highest in the past year of 60. (Tr. at 340.) He concluded:

> The prognosis for Debra is seen as fair. She currently reports a number of medical problems which may relate to psychological factors. She is seen as emotionally labile and this may interfere with her ability to work. Cognitive functioning and memory appear to be within normal limits.
>
> Debra is seen as being able to understand and remember simple instructions. She may have some difficulty carrying out those instructions if considerable physical exertion is required. She is seen as possibly having some difficulty responding appropriately to supervisors and coworkers. She is seen as being able to maintain concentration. She may have some difficulty maintaining attention and work pace. She also may have difficulty withstanding routine work stresses but should be able to adapt to changes.

(Tr. at 340.)

31

On July 7, 2011, Richard Sturm, M.D., conducted a medical evaluation for the agency. (Tr. at 343.) Asked to list her medical problems interfering with work, from worst to least, plaintiff indicated her most substantial problem was anxiety/depression, then back pain, fibromyalgia/arthritis, migraine headaches, and temporomandibular joint dysfunction, combined with irritable bowel syndrome. (Tr. at 343-45.) Due to insurance problems, she had stopped all medications except Cymbalta, which cost $400/month. (Tr. at 345.) On exam, she was alert and pleasant, shifting positions every five or ten minutes. At times, she burst into tears. She ambulated easily with normal station and gait and used no assistive device. She had full range of motion of the neck, shoulders, elbows, hands, and fingers. She also had full range of motion of the low back in all planes. Straight leg raise was negative bilaterally. (Tr. at 347.) Deep tendon reflexes were normal, with good range of motion of both hips. (Tr. at 347-48.) Dr. Sturm assessed depression/anxiety, evaluated elsewhere; reported back pain, relatively non-specific by history and with no recent treatment or specific objective findings on exam; history of fibromyalgia and arthritis, doubtfully rheumatoid arthritis, with no specific findings or limitations noted on exam; history of headaches, with no current treatment; and history of TMJ and IBS, with which plaintiff lived without active treatment and only minor difficulties. He concluded:

> The patient feels most disabled by her depression and anxiety with history of childhood and domestic abuse in the past. I reminded her we do not evaluate those here. Subtracting the psychiatric issues from the equation, there seem to be few other objective findings that would cause occupational impairment at the present time.
>
> Obviously it would be prudent to stop smoking. She ought to apply for health insurance, e.g. BadgerCare, so she could get her medications and office visits covered. Gradually increasing low intensity aerobic exercise should help improve her stamina and reduce stress levels.

> In terms of what sort of work she could do, patient allows she can probably do some sort of light activity such as retail sales as long as it does not require a full 8 hour working day, and would prefer a job fairly near her house, a job that allows for frequent changes of body positions. She could probably do office work, for instance, sales work or light domestic activities, at least if we subtract the mental health issues, based on my findings today.

(Tr. at 348.) An x-ray of the lumbar spine ordered by Dr. Sturm showed minimal degenerative change and no acute injury. (Tr. at 350.)

On July 11, 2011, Roger Rattan, Ph.D., completed a psychiatric review technique report, evaluating plaintiff under Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders). (Tr. at 351.) Under the B criteria of the Listings, Dr. Rattan found mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration. (Tr. at 361.) In an accompany mental RFC report, Dr. Rattan found plaintiff moderately limited in the ability to complete a normal workday without interruptions from psychologically based symptoms, to accept instruction and respond appropriately to criticism from supervisors, to get along with coworkers, and to respond appropriately to changes in the work setting; he found her not significantly limited in other areas. (Tr. at 365-66.) He concluded that she retained the mental capacity to perform the basic mental demands of simple, unskilled work. (Tr. at 367.)

On July 12, 2011, Janis Byrd, M.D., completed a physical RFC report for the agency, finding plaintiff capable of light work. (Tr. at 369-76.) On January 12, 2012, Pat Chan, M.D., completed a second physical RFC report, finding plaintiff capable of light work with no concentrated exposure to hazards. (Tr. at 419-26.) Dr. Chan stated that Dr. Sturm opined that plaintiff could perform "some sort of light activity such as retail sales as long as it does not

33

require a full 8 hour working day." (Tr. at 426.) Dr. Chan opined that there was no objective evidence that would limit plaintiff from working less than 8 hours a day. Thus, Dr. Chan did not give Dr. Sturm's statements great weight. (Tr. at 426.)

On January 12, 2012, Craig Childs, Ph.D., completed a second psychiatric review technique report, evaluating plaintiff under Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), 12.07 (somatoform disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders). (Tr. at 427.) Under the B criteria, Dr. Childs found mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration. (Tr. at 437.) In his mental RFC report, Dr. Childs found plaintiff moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, and respond appropriately to changes in the work setting. He found her not significantly limited in other areas. (Tr. at 441-42.) Dr. Childs noted Dr. Kirkwood's July 2007 statement that plaintiff was not able to work but gave it little weight because that decision is reserved to the Commissioner. He, too, concluded that despite her moderate functional limitations plaintiff retained the ability to sustain the basic mental demands of unskilled work. (Tr. at 443.)

The SSA denied plaintiff's application initially on July 12, 2011 (Tr. at 105) and on plaintiff's request for reconsideration (Tr. at 114) on January 13, 2012 (Tr. at 115). On February 7, 2012, plaintiff requested a hearing before an ALJ. (Tr. at 124).

### 3.    ALJ Hearing

On June 6, 2013, plaintiff appeared with counsel for her hearing before the ALJ. The ALJ also summoned a VE. (Tr. at 46.)

34

### a.    Plaintiff's Testimony

Plaintiff testified that she was 48 years old, 5'9" tall, and 160 pounds.  (Tr. at 50.)  She lived in a house with her grandmother and aunt (Tr. at 51) but sometimes stayed with a friend (Tr. at 73).   She supported herself doing odd jobs such as painting a fence, cleaning someone's house, and bussing tables at a restaurant.  She indicated that she had lived off her divorce settlement until the previous year when the money ran out.  (Tr. at 52.)  She had worked at Pizza Hut delivering pizzas for two or three months in the fourth quarter of 2012.  That job did not work out because she was getting disoriented and losing her way.  (Tr. at 54.)  Plaintiff testified that she drove a car every day, going to daily recovery meetings; she also visited her grandmother once or twice per week.  (Tr. at 52-53.)

Plaintiff testified that she graduated from high school and completed one year of technical school.  (Tr. at 53.)  She related past employment as a bank teller for 10 or 11 months, at a state prison in the social service office for about five months, at a meat market for a few months, and doing telephone sales for a few months.  (Tr. at 54-55.)  While married to her ex-husband, she worked on their dairy farm and cared for their children.  (Tr. at 78-79.)

Plaintiff testified that she could not work because of a mental disability and physical limitations due to her fibromyalgia.  Regarding the mental impairment, plaintiff testified that she was initially diagnosed with bipolar disorder, but it was discovered within the past year that she had borderline personality dissociative disorder.  (Tr. at 56.) Plaintiff testified that she took anti-depressant and anti-anxiety medications in the past, prior to July 2012, which made her symptoms worse.  (Tr. at 58-59.)  The medications also made her numb and unfocused.  (Tr. at 59.)  She testified that she experienced memory problems, short term and long term, as well as flashbacks of past traumas.  She described her mental condition as 13 people sharing one

body living 13 separate lives, "and we don't all know what the other parts are doing." (Tr. at 60.) She also testified that she could not maintain focus and attention (Tr. at 60) and would lose track of what she was doing in the middle of a task (Tr. at 81). Regarding social interactions, she testified that some parts of her personality were very social and other parts very anti-social. In an average month, the anti-social activity would predominate at least two weeks. When that happened, she would isolate; if around people, she would get very silent or very angry. (Tr. at 61.) She indicated that all parts of her personality could follow instructions, "but it's a matter of it could pass it to another part of my personality to continue." (Tr. at 62.) She doubted that she could consistently follow short simple instructions for a sustained period of time.[26] (Tr. at 62.) She also testified that she got really tired after two or three hours. (Tr. at 63.)

Regarding her fibromyalgia, plaintiff testified that she experienced pain in the right side of her body and head, as well as a great deal of stiffness and fatigue. She tried to exercise to help her fibromyalgia, walking one to two miles per day and doing yoga and stretching. (Tr. at 64.) She exercised two to three hours per day to try to abate her fibromyalgia symptoms. She took Lyrica in the past, finding it somewhat affective, reducing the pain 10-20%, but she no longer had insurance and could not afford medicine. She was on the waiting list for Badger Care. (Tr. at 65.) She lost her insurance after her divorce in 2008. (Tr. at 80-81.)

Plaintiff testified that she also had degenerative joint disease in her lower back, which caused constant pain and required her to continually change positions. (Tr. at 67.) She also had TMJ and irritable bowel syndrome, for which she had not treated since the mid-2000's.

_____

[26]Later, on questioning from counsel, plaintiff testified that if given a simple job like putting widgets in a box she would not have problems with concentration. (Tr. at 82.)

36

For the TMJ, she did exercises every day to stretch her neck and jaw muscles.  (Tr. at 68.)
She testified that she fell down some steps while working for Pizza Hut, suffering a whiplash-type injury to her neck and shoulder (Tr. at 68), which got better with treatment (Tr. at 69).

Plaintiff testified that she slept in two to three hour intervals.  (Tr. at 69.)  She laid down to rest for 15 to 30 minutes once or twice per day; sometimes, she would nap for about ½ hour.  (Tr. at 70-71.)  Regarding self-care, plaintiff testified that some of her personalities did not care if they were clean.  (Tr. at 71.)  She could still get up and go out but would not necessarily be clean at least half the time.  (Tr. at 72.)  Plaintiff denied cooking, indicating that she did not have a stove and money to buy food.  She tried to clean up when staying with her friend.  She did laundry at her grandmother's house or her friend's house.  (Tr. at 73.)  She denied helping with outside chores.  (Tr. at 73-74.)  She indicated that she went to church about six times per month.  (Tr. at 74-75.)

Plaintiff testified that she experienced post-traumatic flashbacks daily.  (Tr. at 77, 84.)  She had several traumas in the past, some of which were triggered by her recent work at a restaurant when the chef started yelling.  She would respond by hiding, running, or attempting to use grounding technique she had learned.  (Tr. at 77.)  She indicated that she had been hospitalized for PTSD in Fond du Lac the previous year.  (Tr. at 78.)

### b.  VE Testimony

The ALJ determined that only plaintiff's past work as a bank teller qualified as substantial gainful activity (Tr. at 55), and the VE classified that job as light, skilled work.  (Tr. at 86.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to light work, unable to work on ladders, ropes, scaffolds, or at unprotected heights or with hazards, and mentally limited to no more than

37

simple routine tasks, requiring no more than simple work-related decisions with few changes in the routine work setting and no more than occasional interaction with supervisors, co-workers, and the general public. (Tr. at 87.) The VE responded that such a person could not work as a bank teller but could do other jobs such as housekeeper/hotel maid, production worker helper, and production worker. (Tr. at 87-88.) If the ALJ added that, due to mental problems, the person would be off task 10-15% of the time beyond standard breaks, the jobs could not be done. (Tr. at 88-89.) Two to three monthly absences would also be work preclusive. In response to questions from plaintiff's counsel, the VE indicated that jobs involving rare or less than occasional interaction with others did not exist at the unskilled level. (Tr. at 89.)

### 4. ALJ's Decision

On July 19, 2013, the ALJ issued an unfavorable decision. (Tr. at 19.) At step one, the ALJ determined that plaintiff had not engaged in SGA during the period from her alleged onset date of June 30, 2007, through her date last insured of December 31, 2012. Plaintiff reported performing odd jobs during this time, and her earnings records disclosed $607 income working for Pizza Hut in 2012, but these activities did not rise to the level of substantial gainful activity. (Tr. at 24.)

At step two, the ALJ found that through the date last insured plaintiff had the following severe impairments: adjustment disorder with depressed mood, post-traumatic stress disorder by history, personality disorder, alcohol abuse in partial remission, and fibromyalgia. (Tr. at 24.) The ALJ noted that plaintiff alleged migraine headaches, but she received no treatment for and the record disclosed no functional limitations attributable to this condition. (Tr. at 24-25.) The ALJ similarly found plaintiff's temporomandibular joint disorder and irritable bowel

38

syndrome non-severe, noting the lack of treatment for these conditions since the mid-2000's. Further, while plaintiff alleged back pain with sciatica, images of her lumbar spine revealed only minimal degenerative changes, and plaintiff reported no weight lifting limitation. The ALJ accordingly found this condition non-severe. Finally, while plaintiff testified to injuring her neck and shoulder falling down steps, she also admitted that the alleged whiplash injury was mostly better. The ALJ thus found plaintiff's whiplash non-severe. (Tr. at 25.)

At step three, the ALJ found that none of plaintiff's impairments met or medically equaled a Listing. (Tr. at 25.) The ALJ noted that no Listing specifically covered fibromyalgia, and that the medical evidence did not support a finding that, combined with plaintiff's other impairments, plaintiff's fibromyalgia met or equaled a Listing. (Tr. at 26.)

The ALJ further found that plaintiff's mental impairments, considered singly and in combination, did not meet the criteria of Listings 12.04, 12.06, 12.08, and 12.09. Considering the B criteria of those Listings, the ALJ found mild restriction in activities of daily living, noting that in her function report plaintiff indicated that she drives, shops, pays bills, performs household chores (e.g., dishes, laundry, cleaning), and sometimes prepares meals. (Tr. at 26.) The ALJ found moderate difficulties in social functioning. Although plaintiff reported problems getting along with others, she also indicated that she attended her daughter's sporting events two to three times per month and socialized with family and friends on the phone and internet. She also reported that she enjoyed customer interaction when she worked as a bank teller. At the hearing, plaintiff testified that she was anti-social at least two weeks out of the month, but she also testified that she went to daily recovery meetings, visited her grandmother once or twice per week, and went to church six times per month. Plaintiff also identified previous employment as a bank teller, car salesperson, and telephone salesperson, which required

39

customer service and interaction. The ALJ also found moderate difficulties in concentration, persistence, and pace. In her function report, plaintiff claimed significant difficulty paying attention, finishing what she started, and handling stress or changes in routine. Despite these alleged deficiencies, plaintiff reported during the August 2007 vocational assessment that she could navigate the internet, use e-mail, and operate Microsoft programs. Finally, the ALJ found no episodes of decompensation. (Tr. at 27.)

At step four, the ALJ concluded that plaintiff retained the RFC for light work with no work on ladders, ropes, or scaffolds, and no work at unprotected heights or around dangerous machinery. (Tr. at 27-28.) Mentally, he limited plaintiff to simple, routine tasks requiring no more than simple work-related decisions with few changes in the routine work setting and no more than occasional interaction with supervisors, co-workers, or the general public. In making this finding, the ALJ considered plaintiff's alleged symptoms and the opinion evidence. (Tr. at 28.)

The ALJ first surveyed the opinion evidence regarding plaintiff's mental impairments. On July 31, 2007, Dr. Kirkwood drafted a letter in which she opined that plaintiff was "unable to work at this time" due to bipolar disorder symptoms. (Tr. at 28.) On August 23, 2007, vocational consultant Beining opined that plaintiff was "not employable" at that time. (Tr. at 28.) On June 7, 2011, plaintiff underwent a psychological consultative evaluation with Dr. DeYoung, who noted that plaintiff was emotionally labile, crying and laughing easily; she exhibited some difficulty with recent memory; and her fund of knowledge was mildly limited. However, Dr. DeYoung also noted that her concentration appeared within normal limits, she had no difficulty following a three-step command, she had no difficulty following conversation, and her abstract thinking ability and judgment appeared to be within normal limits. (Tr. at 28.) Dr. DeYoung

40

diagnosed adjustment disorder with depressed mood, post-traumatic stress disorder, alcohol abuse in partial remission, pain disorder, and personality disorder with borderline and histrionic features, and a GAF score of 55. (Tr. at 28-29.) He further opined that plaintiff was able to understand and remember simple instructions (but may have some difficulty carrying out those instructions if considerable physical exertion is required), may have some difficulty responding appropriately to supervisors and co-workers, was able to maintain concentration, may have some difficulty maintaining attention and work pace, and may have some difficulty withstanding routine work stress but should be able to adapt to changes. (Tr. at 29.)

An August 23, 2011, treatment note from ThedaCare Behavioral Health revealed that plaintiff attended sporadically and did not comply with the treatment plan, although it was noted during counseling sessions that her depressive and anxiety symptoms had improved. During a January 5, 2012, intake assessment, plaintiff was assigned a GAF score of 52 and diagnosed with PTSD, bipolar disorder, alcohol dependence in early remission, and marijuana abuse. On July 11, 2011, after examining the evidence of record to that date, state agency consultant Dr. Rattan opined that plaintiff had mild restriction in activities of daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence, and pace; and no repeated episodes of decompensation. On January 12, 2012, consultant Dr. Childs made identical findings. Dr. Childs also opined that, despite moderate functional limitations, plaintiff retained the ability to sustain the basic mental demands of unskilled work. (Tr. at 29.)

A March 12, 2012, progress note from Fond du Lac Community Programs indicated that plaintiff described herself as having multiple personalities, but Dr. Klausen indicated that although plaintiff displayed tendencies towards dissociative identity disorder, plaintiff's multiple personalities appeared to be somewhat self-created. On June 3, 2013, plaintiff's most recent

41

therapist, Stefanie Johnson, signed a letter in which she opined that plaintiff's mental health issues make it very difficult for plaintiff to maintain a full-time job. (Tr. at 29.)

Regarding plaintiff's fibromyalgia and physical symptoms, a February 2008 clinic note from Fond du Lac Regional Clinic revealed that plaintiff presented with back pain that extended up to her head, down to her buttocks, and into her arm. It was noted that she had fibromyalgia and was diagnosed with myofascial pain with trigger points. (Tr. at 29.)

On July 7, 2011, plaintiff underwent a consultative physical exam with Dr. Sturm, who noted that she ambulated easily without an assistive device; that her grip strength was within normal limits; that she had normal range of motion in her shoulders, elbows, hands and fingers; that she had full range of motion of her low back in all planes; her straight leg raises were negative; her deep tendon flexes were normal; she had good range of motion of both hips; and she had a normal neurologic screen. Noting that plaintiff felt most disabled by depression and anxiety, Dr. Sturm indicated that there seemed to be few objective findings that would cause occupational impairment. (Tr. at 30.)

On July 12, 2011, state agency medical consultant Dr. Byrd opined that plaintiff could perform light work. On January 12, 2012, consultant Dr. Chan found plaintiff capable of light work with no concentrated exposure to hazards. (Tr. at 30.)

The ALJ next summarized plaintiff's allegations. At the hearing, plaintiff testified that she could not work because of her dissociative disorder and fibromyalgia. She also testified that she could not perform even simple repetitive tasks that did not require being around people because of "physical pain and nerve damage in her back." (Tr. at 30.) Concerning her alleged dissociative disorder, plaintiff testified that she has 13 different personalities, some of which can work, some of which cannot. She also testified that she has blackouts and lapses in time.

42

Regarding other mental impairments, she testified that she experiences sadness, rage, anger, and fear. She further testified she did not think she could get herself up and cleaned up for a job more than half the time during a month. She also testified, however, that she would have no problems with concentration if she had a simple job. (Tr. at 30.)

With respect to her fibromyalgia, plaintiff testified that the impairment affects the right side of her body, and she experiences burning in her upper back and neck. She also testified that she sometimes will not sleep for three days due to pain. (Tr. at 30.) She further testified that when she does sleep, she does so in two to three hour intervals. (Tr. at 30-31.) She also testified that the pain made her suicidal. (Tr. at 31.)

Regarding her physical activities, plaintiff testified that she walked one to two miles per day, stretched, and did yoga. However, she also testified that she could not stand in one position for any length of time. Additionally, she reported in a physical activities addendum that she could sit for one hour at a time for four or five hours in a day, stand for 15 minutes at a time for three to five hours in a day, and walk two to three hours total in a day. Regarding medications, plaintiff said medications made her mental symptoms worse. Lyrica was somewhat effective for fibromyalgia. She also indicated that side effects from medications included numbness and loss of focus. (Tr. at 31.)

The ALJ then concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. at 29.)

Concerning the alleged symptoms related to mental impairments, the ALJ noted that

43

while plaintiff claimed to have 13 different personalities she had never been diagnosed with multiple personality disorder. Indeed, on March 13, 2012, Dr. Klausen noted that plaintiff's multiple personalities appeared to be self-created. The ALJ also noted that, contrary to plaintiff's alleged anti-social behavior/symptoms, plaintiff testified that she went to daily recovery meetings, visited her grandmother once or twice per week, and attended church six times per month. The ALJ further noted that, contrary to plaintiff's alleged inability to concentrate and follow simple instructions, she reported during an August 23, 2007, vocational assessment that she had the ability to navigate the internet, use e-mail systems, and operate many of the Microsoft office programs. Further, at the hearing, she admitted that she would have no problems with concentration if she had a simple job. To the extent that plaintiff alleged physical limitations due to fibromyalgia symptoms, Dr. Sturm noted no specific findings or limitations during the July 7, 2011, consultative physical examination. Indeed, Dr. Sturm specifically noted that there seemed to be few objective findings that would cause an occupational impairment. (Tr. at 31.) Additionally, plaintiff testified that she had worked several odd jobs since the alleged disability onset date, which demonstrated some capacity to perform work-related functions. Finally, the ALJ noted that, overall, plaintiff had a very poor work record, having been in and out of the workforce over a period of many years irrespective of any alleged disability; this poor work history negatively reflected on plaintiff's credibility. (Tr. at 32.)

Regarding the opinion evidence, the ALJ afforded "medium weight" to Dr. Sturm's July 7, 2011, opinion because the objective medical evidence reasonably supported a limitation to light work; a prohibition against climbing ladders, ropes, or scaffolds; and a prohibition against working at unprotected heights or around dangerous machinery. The ALJ gave significant

44

weight to the opinions of the state agency consultants, Drs. Childs, Rattan, Byrd, and Chan, because they are familiar with SSA standards and their findings were consistent with the objective medical evidence.  In accordance with SSR 06-3p, the ALJ also considered the opinions of Ms. Beining and Ms. Johnson, affording no weight to Beining's conclusion that plaintiff was "not employable" because it addressed an issue reserved to the Commissioner.  For the same reason, to the extent that Johnson's June 3, 2013, letter opined that plaintiff could not work, the ALJ gave it no weight in assessing plaintiff's RFC.  (Tr. at 32.)

The ALJ concluded that the RFC accommodated plaintiff's impairments and was supported by the objective medical evidence, as well as the reports of Drs. Sturm, Childs, Rattan, Byrd, and Chan.  In assessing RFC, the ALJ took notice of plaintiff's GAF scores of 55 and 52, assigned on June 7, 2011, and January 5, 2012, respectively.  The ALJ noted that GAF scores are not intended for forensic purposes, such as an assessment of disability; GAF represents a one-time snapshot of the patient's condition; and scores between 51-60 correspond to only moderate symptoms.  (Tr. at 32.)

Based on this RFC, the ALJ concluded that plaintiff could not perform her past relevant work as a bank teller.  (Tr. at 33.)  However, relying on the VE's testimony, the ALJ found that plaintiff could perform other jobs, such as housekeeper/hotel maid, production worker helper, and production worker.  (Tr. at 33-34.)  The ALJ accordingly found that plaintiff was not under a disability at any time from June 30, 2007, the alleged onset date, through December 31, 2012, the date last insured.  (Tr. at 34.)

### 5.  Appeals Council Review

Plaintiff requested review of the ALJ's decision by the Appeals Council (Tr. at 17), submitting a letter from therapist Johnson dated July 3, 2014 (Tr. at 538).  Johnson indicated

45

that in recent months plaintiff's transition from one part of her personality to another happened more frequently and rapidly, which caused her to have a difficult time adjusting to her surroundings. This experience could make work difficult for her and cause added stress and anxiety. Plaintiff also required rest in order to take care of herself physically, mentally, and emotionally. Johnson concluded: "In my professional opinion, Debra is unable to work full time in order to support herself sufficiently given her significant mental health issues." (Tr. at 538.)

On August 5, 2014, the Appeals Council denied the request for review. (Tr. at 1.) This action followed.

### III. DISCUSSION

Plaintiff argues that the ALJ erred in rejecting the opinions of her treating providers, evaluating her credibility, and determining RFC. I address each argument in turn.

**A.    Treating Source Reports**

**1.    Legal Standards**

The ALJ must consider all medical opinions in the record. Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013). However, the nature of that consideration will vary depending on the source.

Opinions from the claimant's treating physician are entitled to "special significance" and will, if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, be given "controlling weight." SSR 96-8p, 1996 SSR LEXIS 5, at *20-21. If the ALJ finds that a treating source's opinion does not meet the standard for controlling weight, he may not simply reject it, SSR 96-2P, 1996 SSR LEXIS 9, at *9; rather, he must determine what weight the opinion does deserve

46

by considering a variety of factors, including the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008). Whenever an ALJ discounts a treating source's opinion, he must provide "good reasons." Scott, 647 F.3d at 739.

Opinions from non-physician providers, such as therapists, cannot establish the existence of a medically determinable impairment and may not receive controlling weight. SSR 06-3p, 2006 SSR LEXIS 5, at *3-4. Nevertheless, opinions from these "other sources" are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file. Id. at *8; see also Voigt v. Colvin, 781 F.3d 871, 878 (7th Cir. 2015).

**2.    Analysis**

Plaintiff argues that the ALJ erred in his treatment of the opinions from Dr. Kirkwood and therapist Johnson, as well as the report from vocational consultant Beining.

**a.    Dr. Kirkwood**

While the ALJ mentioned Dr. Kirkwood's July 31, 2007 letter opining that plaintiff was unable to work due to bipolar disorder (Tr. at 28), he failed to state what weight, if any, he gave that opinion (see Tr. at 32, explaining the weight afforded other medical opinions). As the parties note, the ALJ did give significant weight to Dr. Childs's opinion, and Dr. Childs, in turn, considered Dr. Kirkwood's July 31, 2007 letter, giving it little weight because it opined on an issue reserved to the Commissioner (Tr. at 443), i.e., whether plaintiff was able to work. See

47

20 C.F.R. § 404.1527(d).  The Commissioner argues that any error in not explicitly weighing Dr. Kirkwood's opinion was harmless because he indirectly factored it into his decision by accepting Dr. Childs's report.

Even if an ALJ may implicitly reject a treating source report in this fashion, the Commissioner's argument fails.  Opinions on issues reserved to the Commissioner should not be rejected for that reason alone.  See Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012) (explaining that while opinions on issues reserved to the Commissioner do not receive special significance, that's "not the same thing as saying that such a statement is improper and therefore to be ignored"); SSR 96-5p, 1996 SSR LEXIS 2, at *6 ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. . . . However, opinions from any medical source on issues reserved to the Commissioner must never be ignored.").

Further, as Seventh Circuit recently reiterated, if the ALJ cannot determine the basis for an opinion on an issue reserved to the Commissioner, he should re-contact the treating source for clarification:

> The administrative law judge gave "no weight" to the opinion of Garcia's treating physician that his patient was "disabled and unable to perform any functions." The judge's ground was that determining disability is reserved to the Commissioner of Social Security (by which the administrative law judge meant reserved to him). That isn't true. What is true is that whether the applicant is sufficiently disabled to qualify for social security disability benefits is a question of law that can't be answered by a physician. But the answer to the question depends on the applicant's physical and mental ability to work full time, and that is something to which medical testimony is relevant and if presented can't be ignored. Though not bound by the statement in the doctor's letter that "Mr. Garcia will be unable to return to any form of employment," because a doctor may not be acquainted with the full range of jobs that a person with Garcia's ailments could fill, the administrative law judge, if he thought this a possibility, should have asked the doctor to specify more exactly what "functions" Garcia is incapable of performing.

48

Garcia v. Colvin, 741 F.3d 758, 760-61 (7th Cir. 2013) (internal citations omitted); see also SSR 96-5p, 1996 SSR LEXIS 2, at *5-6 ("For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us."). In the present case, the ALJ did not re-contact Dr. Kirkwood, nor did he consider whether her treatment notes provided a basis for her conclusion that plaintiff was unable to work.

### b. Therapist Johnson

The ALJ gave "no weight" to Johnson's June 3, 2013 letter, because it involved issues reserved to the Commissioner.[27] (Tr. at 32.) Echoing her previous argument regarding Dr. Kirkwood, the Commissioner contends that the ALJ appropriately gave no weight to Johnson's statement that plaintiff could not hold down a full-time job because that is an issue reserved to the Commissioner. As discussed above, medical opinions should not be rejected on that

---

[27]Plaintiff also cites Johnson's July 3, 2014 letter (Tr. at 538), submitted to the Appeals Council. Because this evidence was not before the ALJ, I may not consider it in reviewing his decision. See Rice v. Barnhart, 384 F.3d 363, 366 n.2 (7th Cir. 2004) ("Although technically a part of the administrative record, the additional evidence submitted to the Appeals Council . . . cannot now be used as a basis for a finding of reversible error."). In her reply brief, plaintiff contends that the court may consider this letter as "new" and "material" evidence. She also contends that the Appeals Council made a mistake of law in failing to address whether the letter was new and material evidence. Arguments raised for the first time in reply are waived. E.g., Nationwide Ins. Co. v. Cent. Laborers' Pension Fund, 704 F.3d 522 , 527 (7th Cir. 2013). Further, while the court may, under 42 U.S.C. § 405(g), sentence six, remand where new, material evidence is adduced that was for good cause not presented before the agency, evidence presented to the Appeals Council is not "new." DeGrazio v. Colvin, 558 Fed. Appx. 649, 652 (7th Cir. 2014). Finally, plaintiff fails to develop an argument that the Appeals Council committed an error of law in its consideration of this evidence. See Perkins v. Chater, 107 F.3d 1290, 1294 (7th Cir.1997) (setting forth the limited grounds on which a claimant may challenge the Appeals Council's decision to deny review); Yerk v. Colvin, 14-C-1216, 2015 U.S. Dist. LEXIS 57399, at *61-69 (E.D. Wis. May 1, 2015) (rejecting claim of error in case involving the same language in the Appeals Council's order).

49

basis alone.[28] In any event, Johnson provided more than a bottom line, discussing plaintiff's history, treatment, and why she would have a hard time maintaining employment. (Tr. at 537.)

The Commissioner agrees that therapists may provide evidence regarding functional limitations but contends that in this case the rest of therapist Johnson's statement relates almost entirely to the impact of plaintiff's alleged dissociative/multiple personality disorder, which was not diagnosed as a medically determinable impairment by any acceptable medical source. The Commissioner contends that, absent such a diagnosis, the ALJ correctly ignored all related symptoms. See Brihn v. Astrue, 332 Fed. Appx. 329, 333 (7th Cir. 2009) ("An ALJ has no obligation to discuss residual functional capacity in light of impairments that are not medically established.").

While the ALJ did, in discussing credibility, note that plaintiff had not been diagnosed with multiple personality disorder (Tr. at 31), he did not reject Johnson's report on this basis, and my review is limited to the reasons the ALJ provided. See Hanson v. Colvin, 760 F.3d 759, 762 (7th Cir. 2014) (noting that an ALJ's decision must be upheld, if at all, on the basis articulated in the decision). Moreover, the Commissioner's argument overlooks the fact that Johnson also based her opinion on plaintiff's diagnoses of bipolar disorder and PTSD (Tr. at

---

[28]Neither of the cases the Commissioner cites support her argument that opinions on issues reserved to the Commissioner may be rejected for that reason alone. Rather, they stand for the rule set forth in the text above – that such opinions do not receive controlling weight. See Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010) (stating that "the ALJ is not required to give controlling weight to the ultimate conclusion of disability – a finding specifically reserved for the Commissioner"); Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002) ("Dr. Olson's general opinion that Johansen was 'unable to work gainful employment because of his chronic neck [pain], left arm pain and low back pain' is not conclusive on the ultimate issue of disability, which is reserved to the Commissioner.").

50

537), impairments that <u>were</u> diagnosed by acceptable medical sources (Tr. at 251, 417).[29]  The Seventh Circuit has repeatedly stated that RFC must be based on the combined effects of all of the claimant's medical problems, <u>see, e.g.</u>, <u>Engstrand v. Colvin</u>, No. 14-2702, 2015 U.S. App. LEXIS 9333, at *14 (7th Cir. June 5, 2015), and that the ALJ should not discount symptoms just because their etiology may be unclear, <u>see, e.g.</u>, <u>Parker v. Astrue</u>, 597 F.3d 920, 922 (7th Cir. 2010).[30]

### c.  Vocational Consultant Beining

The ALJ also gave no weight to Beining's opinion that plaintiff was "not employable" because it related to an issue reserved to the Commissioner.  (Tr. at 32.)  Again, relevant evidence should not be rejected for this reason alone.  Further, like Johnson's letter, Beining's report offered more than a bottom line.  For instance, she also relied on the 2007 opinions of Drs. Kirkwood and Whitmore, which the ALJ did not discuss.  The Commissioner notes that the record contains just one report from Dr. Whitmore (from 2006, before the alleged disability onset date), which states that plaintiff cannot handle heavy physical labor or medium labor on an ongoing basis.  (Tr. at 254.)  The Commissioner contends that this is consistent with the ALJ's RFC for light work.  However, in both his 2006 report (Tr. at 254), and the 2007 report quoted by Beining (Tr. at 526), Dr. Whitmore also opined that while plaintiff could physically tolerate desk work she would likely have intermittent absences due to her health problems.  Based on Dr. Whitmore's opinion, plaintiff's work history between 2005 and 2007, and plaintiff's

---

[29]It also overlooks Dr. Klausen's statement that plaintiff "displays tendencies towards a dissociative identity disorder.  Her ability to dissociate is not questioned."  (Tr. at 411.)

[30]Indeed, the ALJ recognized this at the hearing, noting that he was concerned not so much with the diagnoses, of which there were several, as he was with the symptoms and limitations flowing from plaintiff's mental impairments.  (Tr. at 58.)

51

statements concerning good and bad days, Beining opined that while plaintiff could land a job she would not able to maintain it. (Tr. at 529.) The ALJ failed to consider this evidence.[31]

## B.    Credibility

### 1.    Legal Standard

In making a credibility determination, the ALJ must first decide whether the claimant suffers from medically determinable impairments that could reasonably be expected to produce the pain or other symptoms alleged. If the claimant has no such impairments, the alleged symptoms cannot be found to affect her ability to work. If such impairments are shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's ability to work. SSR 96-7p, 1996 SSR LEXIS 4, at *5-6. In making this determination, the ALJ must consider, in addition to the medical evidence, the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Id. at *8. Although the reviewing court defers to an ALJ's credibility determination that is not patently wrong, the ALJ must competently explain his finding with specific reasons supported by the

_____

[31]It is unclear why Dr. Whitmore's August 18, 2007 report is not in the record. The record also appears to be missing notes from Dr. Dy (see Tr. at 514), Dr. Whelan (see Tr. at 404), and page(s) from plaintiff's December 29, 2011 ER visit (see Tr. at 403). The parties may want to look into this on remand.

record.  Engstrand, 2015 U.S. App. LEXIS 9333, at *12.

**2.    Analysis**

In the present case, the ALJ found that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (Tr. at 29.)  An ALJ's finding "that a witness's testimony is 'not _entirely_ credible' yields no clue to what weight the trier of fact finding gave the testimony," Bjornson, 671 F.3d at 645, but the ALJ in this case did provide some additional reasons for his finding.  See Pepper v. Colvin, 712 F.3d 351, 367-68 (7th Cir. 2013) (indicating that use of such boilerplate may be deemed harmless if the ALJ goes on to support his finding).

The ALJ first stated that, while plaintiff claimed to have 13 different personalities, she had never been diagnosed with multiple personality disorder, and Dr. Klausen noted that plaintiff's multiple personalities appeared to be self-created.  (Tr. at 31.)  These observations are correct, but the ALJ failed to explain why they meant plaintiff was lying or exaggerating. As discussed above, Dr. Klausen did not question plaintiff's ability to dissociate (Tr. at 411), and therapist Johnson's June 2013 letter discussed in detail plaintiff's ability to identify different parts of her personality (Tr. at 537), evidence medically supporting plaintiff's testimony.[32]

---

[32]The Commissioner argues that the regulations barred the ALJ from considering plaintiff's subjective allegations related to her alleged dissociative disorder.  See 20 C.F.R. § 404.1529(a).  The ALJ did not reject plaintiff's testimony on this basis, and as discussed in the text, the statements from Dr. Klausen and therapist Johnson could have allowed plaintiff to genuinely believe she had a dissociative disorder.  See Sarchet v. Chater, 78 F.3d 305, 308 (7th Cir. 1996) (rejecting adverse credibility finding based on the claimant's testimony that she suffered a heart attack where the medical evidence did not support a "myocardial infarction" but did show tachycardia, which the claimant could have believed a form of heart attack).

53

Second, the ALJ noted that, contrary to plaintiff's alleged anti-social behavior/symptoms, plaintiff went to recovery meetings, visited her grandmother, and attended church. Plaintiff testified that sometimes she gets along with others and sometimes does not (Tr. at 61), which is not inconsistent with occasionally getting together with family or friends. See Mason v. Barnhart, 325 F. Supp. 2d 885, 904 (E.D. Wis. 2004); see also Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011).

Third, the ALJ noted that, contrary to plaintiff's alleged inability to concentrate and follow simple instructions, she reported during the August 2007 vocational assessment that she had the ability to navigate the internet, use e-mail systems, and operate Microsoft office programs. (Tr. at 31, 528.) While plaintiff did tell Beining that she knew how to use computer programs and office equipment, she also advised Beining that she had been terminated from her clerical job at a prison due to mistakes relating to concentration issues. See O'Connor-Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir. 2010) (explaining that a person's ability to learn how to do a task does not necessarily mean she can sustain adequate performance of the task). Further, at the hearing, plaintiff testified that she did not have a computer and rarely used one. (Tr. at 75-76.) The ALJ also stated that, at the hearing, plaintiff admitted that she could concentrate well enough to do a simple job. (Tr. at 31.) Presumably, the ALJ was referring to plaintiff's admission that she would not have "problems with concentration . . . with like putting widgets in a box." (Tr. at 82.) It is hard to see what that statement is worth. Earlier in the hearing, plaintiff testified that she doubted that she could consistently follow short simple instructions for a sustained period of time. (Tr. at 62.)

Fourth, to the extent that plaintiff alleged physical limitations due to fibromyalgia symptoms, the ALJ noted that Dr. Sturm found few objective findings that would cause an

54

occupational impairment. (Tr. at 31.) Since objective clinical tests cannot measure the severity of fibromyalgia, see Sarchet, 78 F.3d at 307, this was not surprising. In any event, despite the absence of objective findings, Dr. Sturm found plaintiff limited to light work, "at least if we subtract the mental health issues." (Tr. at 348.) Dr. Sturm also seemed to question plaintiff's ability to work full-time.[33] (Tr. at 348.)

Fifth, the ALJ noted that plaintiff worked several odd jobs since the alleged disability onset date, which demonstrated some capacity to perform work-related functions. However, the ALJ failed to specify what functions were involved in those jobs and how they conflicted with plaintiff's statements about her limitations. See Shafer v. Colvin, No. 13-C-929, 2014 U.S. Dist. LEXIS 61843, at *36-37 (E.D. Wis. May 5, 2014) (indicating that if an ALJ relies on a claimant's activities to find her incredible he should explain how those activities undercut her claims); cf. Gleason v. Colvin, No. 13-C-1378, 2015 U.S. Dist. LEXIS 70494, at *65 (E.D. Wis. May 29, 2015) (affirming ALJ's reliance on the claimant's part-time pizza delivery job as it conflicted with his alleged vision problems). The fact that a person forces herself to work out of desperation does not mean she is not disabled. See, e.g., Garcia v. Colvin, 741 F.3d 758, 760 (7th Cir. 2013). Here, plaintiff testified that she took "[a]ny odd jobs that I can manage to do to feed myself." (Tr. at 52.)

Finally, the ALJ noted that plaintiff had a poor work record overall, having been in and out of the workforce over a period of many years irrespective of any alleged disability. (Tr. at

---

[33]Dr. Chan read Dr. Sturm's report to state that plaintiff could perform light activity as long as it did not require a full 8-hour working day. Dr. Chan declined to give weight to that opinion because there was no objective evidence that would limit plaintiff to less than full-time work. (Tr. at 426.) It is unclear whether Dr. Sturm found plaintiff limited to part-time work or whether he was merely reporting plaintiff's statement that she could do light activity as long as it did not require a full work day. (Tr. at 348.) This issue, too, may be explored on remand.

55

32.)  However, before relying on a claimant's work history, the ALJ should consider factors that may have contributed to it, such as the alleged disabling condition itself, limited education, lack of job opportunities, or child care responsibilities.  See, e.g., Sarchet, 78 F.3d at 308; McGee v. Astrue, 770 F. Supp. 2d 945, 947 n.1 (E.D. Wis. 2011).  The record here shows that for more than 20 years plaintiff assisted her husband in operating the family dairy farm while raising their children.  After the dissolution of her marriage, she worked various short-term jobs, which, according to plaintiff (and vocational consultant Beining), plaintiff was unable to maintain due to her impairments.

## C.    RFC

### 1.    Legal Standard

In determining RFC, the ALJ must consider all limitations that arise from medically determinable impairments, even those that are not severe.  Villano v. Astrue, 556 F.3d 558, 563 (7th Cir. 2009).  If the ALJ relies on vocational testimony, he is also required to orient the VE to the totality of the claimant's limitations.  "Among the limitations the VE must consider are deficiencies of concentration, persistence and pace."  O'Connor-Spinner, 627 F.3d at 619.

### 2.    Analysis

In addition to the errors discussed above, the ALJ did not in determining RFC sufficiently account for plaintiff's deficiencies in concentration, persistence, and pace.  The ALJ accepted that plaintiff had moderate limitations in this area (Tr. at 27), but the RFC for simple, routine work with limited changes and interaction with others failed to account for them.  See O'Connor-Spinner, 627 F.3d at 620 ("In most cases, . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that

56

present significant problems of concentration, persistence and pace."); <u>Stewart v. Astrue</u>, 561 F.3d 679, 684-85 (7th Cir. 2009) (rejecting argument that the ALJ accounted for the claimant's limitations in concentration, persistence, and pace by restricting her to simple, routine tasks that do not require constant interactions with coworkers or the general public).

Relying on <u>Johansen v. Barnhart</u>, 314 F.3d 283, 288 (7th Cir. 2002), and <u>Milliken v. Astrue</u>, 397 Fed. Appx. 218, 222 (7th Cir. 2010), the Commissioner argues that the ALJ properly relied on the opinions of Drs. Rattan and Childs, who "translated" plaintiff's moderate limitations into an RFC for simple, unskilled work. The Seventh Circuit recently rejected a similar argument, distinguishing <u>Johansen</u> as a case in which the ALJ also limited the claimant to repetitive, low stress work, which would exclude the positions likely to trigger the panic disorder that formed the basis for the claimant's limitations in concentration, persistence, and pace. <u>Yurt v. Colvin</u>, 758 F.3d 850, 858 (7th Cir. 2014). The court reiterated that "we have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." <u>Id.</u> at 858-59; <u>see also</u> <u>Olson v. Colvin</u>, No. 13-C-15, 2014 U.S. Dist. LEXIS 9551, at *9-10 (E.D. Wis. Jan. 27, 2014) (rejecting similar argument based on <u>Johansen</u> and <u>Milliken</u>).

## IV. CONCLUSION

Plaintiff seeks a judicial award of benefits or, in the alternative, remand for rehearing under 42 U.S.C. § 405(g), sentence four. An award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability. <u>Allord v. Astrue</u>, 631 F.3d 411, 417 (7th Cir. 2011). As discussed above, issues remain for resolution in this case, including the weight to be assigned the reports of Dr. Kirkwood, therapist Johnson, and

consultant Beining; proper evaluation of plaintiff's credibility under SSR 96-7p, 1996 SSR LEXIS 4; and reconsideration of RFC.  The case must be remanded so that the ALJ may address these issues in the first instance.  See <u>Hunt v. Astrue</u>, 889 F. Supp. 2d 1129, 1149 (E.D. Wis. 2012) (remanding to address similar issues).

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 15th day of June, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Judge

58